UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                        Case No.  6:25-cr-12-PGB-

CHARLES WILLIAM MAITSKI

_____

## DEFENDANT'S SENTENCING MEMORANDUM AND
## MOTION FOR DOWNWARD VARIANCE

COMES NOW, the Defendant, Charles William Maitski, by and through undersigned counsel, and files this Sentencing Memorandum and Request for Downward Variance in the above case. Mr. Maitski submits that a downward variance to 180 months in prison, (15-year minimum mandatory) followed by 180 months of supervised release is sufficient, but not greater than necessary, to comply with the purposes of sentencing enumerated in 18 U.S.C. § 3553(a).  In support of his request for a downward variance, Mr. Maitski states the following:

## PROCEDURAL BACKGROUND

Mr. Maitski is currently before this Court having plead guilty to Count One, Five, Six and Twelve of the Indictment pursuant to a plea agreement (Doc.

1

37). The final Pre-Sentence Report was filed on October 7, 2025. (Doc. 50). Both Count Groups begin with a Base Offense Level of 32. Count Group 1 receives a +2 for involving a victim between the age of 12-16, a +2 for distribution of child pornography, (by sending explicit images of a teen boy to E.R. as his fake persona), +2 for a knowing misrepresentation of his identity to the victim and/or use of a computer. The resulting adjusted offense level for Count Group 1 is 38. (PSR ¶60) Count Group 2 also begins at 32 and has the same specific offense characteristics, but also includes a +2 for a sexual act (victim is masturbating in a video) and +4 for portrayal of sadistic or masochistic conduct, (victim licks a toilet seat while nude). The resulting adjusted offense level for Count Group 2 is 44. (PSR ¶70) Mr. Maitski also received a 1-level increase for the number of units, and a 5-level increase pursuant to Chapter 4 for the pattern of activity involving additional victims, taking the adjusted offense level to 50. (PSR ¶75) Mr. Maitski received a 3-level reduction for acceptance of responsibility pursuant to § 3E1.1(a) and (b) with a resulting Total Offense Level of 47, reduced to 43 pursuant to Chapter 5, Part A. (PSR ¶ 79).

The PSR submits the proper sentencing range under the guidelines is life in prison, despite Mr. Maitski's placement in Criminal History Category I. (PSR ¶ 108). There are no outstanding objections to the calculations in the PSR.

**ARGUMENT IN SUPPORT OF REQUESTED
DOWNWARD VARIANCE IN SENTENCE BASED UPON 3553(a)**

I.    **History and Characteristics of Mr. Maitski**

Both of Mr. Maitski's parents are now deceased. He was raised by them alongside his four siblings, Marie, Patty, Tom and Frank in the Catholic faith. By all regards, Mr. Maitski had a normal "good" upbringing in a middle-class family. It is apparent from his own letter and the letters of his siblings that aside from the conduct in this case he has lived by the values of hard work, education, kindness to those around him and a mindset of giving back to his community and family.

Despite the family's shock, each of his siblings wish to support him because they know his character. His brother Tom described him as a good and generous person, with a good life who "blew it" (PSR ¶ 88). His brother Frank called him a "solid family man… always doing the big and little things to turn his house into a home." (See Ex. 2) His sister Marie described him as empathetic, protecting a schoolmate from bullying, helping his blind friend with maintaining independence, helping his elderly parents and noted that he built a good life in Florida. (See Ex. 3) His sister Patty speaks glowingly of him as a proud and devoted father, and husband, "he looked at Maria with such love and tenderness; his heart bursting with joy. Their son, Alex, was the love of their lives." (See Ex. 5).

Notably though, three of his siblings reside in Pennsylvania, and one in California. His best friend from childhood, Andre, who also lived in Pennsylvania, died of cancer a few years after Mr. Maitski lost his job, causing him serious grief when he was already struggling with depression due to his unemployment and changing familial role. The only mention of other friends by he or his siblings include a childhood schoolmate who was disabled, who died before adulthood, and a legally blind man, Brian, who Mr. Maitski befriended in Florida.

Dr. Orozco evaluated Mr. Maitski and reported the existence of persistent depressive symptoms, which first emerged around 2010, when his prolonged period of unemployment began. These symptoms include low mood, emotional withdrawal, diminished self-worth, and a decline in marital intimacy. (PSR p. 43) Dr. Orozco noted a lack of "good close friends" and she pointed out the clinical relevance: this prolonged absence of close interpersonal connections likely reinforced Mr. Maitski's tendency to withdraw and cope with his depression in isolation, relying on solitary maladaptive behaviors as a means of emotional regulation and avoidance.

In addition to explaining from a clinical perspective how Mr. Maitski strayed from his otherwise law-abiding lifestyle, her report finds that he is a good candidate for treatment. During the evaluation, Mr. Maitski demonstrated good

4

insight into his emotional distress and related treatment needs. "Despite the seriousness of his charges, Mr. Maitski presents as amenable to treatment and is considered a viable candidate for rehabilitative intervention. His prognosis is favorable, supported by protective factors such as his intellectual strengths, consistent work history, psychological transparency and motivation for change." (PSR, p. 44) "His responses suggested an acknowledgment of important problems and a recognition of the need for help in addressing these difficulties. Mr. Maitski reported a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. Importantly, he also noted a number of other strengths that are encouraging indicators of a relatively smooth treatment process and a reasonably good prognosis." (PSR, p. 40)

The PSR cites Mr. Maitski's lack of criminal record as a basis to sentence him outside the guideline system. (PSR ¶125) Counsel submits his many positive characteristics described above, including a lack of criminal record, and documented good prognosis for treatment demonstrate that a downward variance is appropriate.

In addition, Mr. Maitski points out that the guideline system is inherently flawed in that he is not receiving any benefit for his acceptance of responsibility, which is a factor of his good character. He submits that at the least, a variance

should factor in a 3- level reduction from offense level 43 to offense level 40. Without that, there would be no motivation for the highest scoring offenders to accept responsibility. This 3-level change would result in a sentencing range of 292-365 months instead of "life".

Also, with regard to his acceptance of responsibility and good character, it is important to note that after his arrest in this case, his counsel contacted prosecutors to notify them of his willingness to cooperate, and offer to assume his online identifies if it would help them investigate other offenders, and his offer to attempt to identify additional victims. Unfortunately, the Government declined his offer regarding use of his online accounts, as likely fruitless, and did not schedule a proffer meeting in an attempt to identify other victims until seven more months had passed. During this proffer, Mr. Maitski was entirely forthcoming regarding this offense and also provided information on other topics.  His willingness to sit for a proffer is indicative of his acceptance of responsibility which he is not actually being credited for, and his good character.

Furthermore, with regard to acceptance of responsibility, he has taken the initiative to pre-pay $20,400 in special assessment or restitution for the case in anticipation of the judgment being imposed. (Doc. 43) He understands these are not voluntary payments by any means, for which he deserves "special credit," but

it is absolutely indicative of his acceptance of responsibility and the seriousness with which he takes his obligation to pay for his crimes.

II.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

*"*Catfishing*"* is a deceptive activity where a person creates a fictional persona or fake identity on a social networking service, usually targeting specific individuals. *See* Marissa A. Mosley, Morgan Lancaster, M. L. Parker & Kelly Campbell (2020), *Adult attachment and online dating deception: a theory modernized, Sexual and Relationship Therapy*, 35:2,227-243, DOI: 10.1080/14681994.2020.1714577. A recent online study of 27 self-identified "catfish" found that often the motivation for deceptions include loneliness and ongoing struggles with social connection, also many reported feelings of guilt and self-loathing around their deceptive behavior: 'It's hard to stop the addiction. Reality hit, and I felt like a shitty human.'" (https://phys.org/news/2018-07-catfish-people-onlineit-money.html, Ex. 6).  Mr. Maitski is no different, he was struggling with social connection, loneliness, clinical depression and wanted some emotional connection to boost  his self-esteem. Also like those in the study, he was addicted to the behavior. (PSR, p. 37)

Between 2010 and 2015, Mr. Maitski lost his job twice, spent years unemployed, lost $70,000 in a failed business and his childhood best friend died. (Ex. 1) Throughout this time he was unable to pull himself out of depression and isolated himself spending countless hours on the internet, starting with legal

7

adult pornography. He stumbled across "Omegle," a platform used to see and talk to complete strangers, advertised on a pornography website. He took the bait, as intended, however, he discovered the platform was mainly utilized by a much younger demographic. In order to use it to talk to people, it became apparent that he had to hide his true age. He found that, "with the anonymity of the internet, and a judgment free atmosphere, they would share their inner most secrets and I found it intoxicating."

At this point in his life, Mr. Maitski was unemployed in his mid to late forties, living as a "house husband". He had assumed full-time caregiving responsibilities for his son, and due to the financial strain of losing his job, his wife took on more working hours, negatively impacting the dynamic of their marriage. He experienced persistent feelings of diminished self-worth and emotional inadequacy, in this untraditional male role and there was a marked deterioration in the marital relationship and intimacy. (PSR, p. 38) Mr. Maitski was unable to find stable employment again as an x-ray technician until 2016. At that point, what began as too much time spent on pornography during unemployment had spiraled into illegal behavior, and a full-fledged behavioral addiction. Dr. Orozco opined that "what initially functioned as a maladaptive coping strategy gradually evolved into a compulsive and entrenched pattern of

behavior… ultimately developing into a behavioral addiction." Further she stated, "over time, he began to prioritize this activity over meaningful interpersonal interactions and daily responsibilities despite experiencing feelings of shame, guilt, and emotional disconnection." She also found that, "he lacked the psychological insight and adaptive coping skills necessary to interrupt this cycle, which further entrenched the behavior. This pattern reflected the progression of pornography addiction, marked by a cycle of emotional distress, compulsive engagement, and escalating dysfunction in his behavioral patterns and emotional regulation."

He was so entrenched in this addiction that even once Mr. Maitski found a full-time job as an x-ray technician again in 2016, he was unable to stop engaging in these deceptive sexual conversations with minor victims. However, despite the length of time that this went on, Mr. Maitski was never in actual physical contact with a victim, or even in close physical proximity to a victim. He intentionally avoided conversations with victims in Florida out of fear they may want to try to meet "Chuck" the 15-year-old boy from Orlando in real life. This was a conversation he wanted to avoid, for the fact that he was lying about his identity, but also because he had a moral line drawn in his head that he had no intention of ever crossing. It was all intended "just to see if it would work" for an emotional

connection he was missing, and when it did work, he became unable to stop. He never even considered an affair in real life with any adult women, because he didn't want to jeopardize his marriage and intact family unit. Mr. Maitski is well aware that the Government will argue that the length of time this was going on is an aggravating factor for sentencing, which he does not dispute that it is. But, it also proves that if he had any intention of escalating his behavior to an in person meeting or sexual encounter with a child there was ample time in over a decade to do so, and he never did.

The clinical depression that led to his downward spiral and deceptive illegal behaviors are relevant "nature and circumstances" to support a downward variance. Further, the lack of physical contact with any victim, absence of a position of trust, or familial relationship, and absence of any threatening or extortion type behaviors to induce victims to produce child pornography, which are present in a majority of production of child pornography cases, weigh in favor of a downward variance rather than a guideline sentence.

III. **The Need for the Sentence To Promote Certain Statutory Objectives**:

**(A) Reflect the seriousness of this offense, promote respect for the law and provide just punishment for this offense**

Mr. Maitski submits that imposition of the 15-year minimum mandatory

penalty reflects the seriousness of the offense, and when promoting respect for the law and assuring a just punishment for the offense, the Court can also consider the guideline punishment for other serious offenses where the defendant is in criminal history category I. For example, if a defendant committed second degree murder, his base offense level would be 38, and there are no specific offense characteristic increases available. *See* USSG §2A1.2. With a three-level reduction for acceptance of responsibility, the total offense level would be 35. At criminal history category I, that defendant would face a sentencing range of 168 to 210 months, or 14 to 17½ years. No one could suggest second degree murder is not a serious offense involving the killing of another human being. Appropriately, the base offense level for second degree murder is 38, which is 6 levels higher than the base offense level for production of child pornography, the guidelines driver in this case. *Compare* USSG § 2A1.2(a), with USSG §2G2.1(a). However, what inflates the guidelines for production of child pornography is the numerous specific offense characteristics that apply in virtually every case. Mr. Maitski goes from a base of 32 to 44 based on specific offense characteristics far exceeding the offense level for second degree murder, and also exceeding the base offense level for first degree murder, which is 43. *See* USSG §2A1.1.

Another pertinent example is the crime of solicitation to commit murder, which is assigned offense level 33. Four levels are added if the offense involved a payment, yielding offense level 37. After the three-level acceptance of responsibility reduction, at criminal history category I, the guideline range is 151 to 188 months' imprisonment.

Finally, as an example, a defendant who commits an assault with the intent to commit murder faces a base offense level of 33 if the object of the offense would have constituted first degree murder. If the victim sustained permanent or life-threatening injuries, four more levels are added. *See* USSG § 2A2.1(b)(1)(A). If the offense involved a payment, another four levels are added. See USSG § 2A2.1(b)(2). The resulting offense level would be 41. For a first-time offender, who gets acceptance of responsibility, the guideline range would be 235 to 292 months of imprisonment, significantly below the guideline range Mr. Maitski faces in this case, where no physical contact with a victim even occurred.

Mr. Maitski submits these comparative arguments not to diminish the severity of his own offense conduct, but instead to draw attention to the inherent flaw of the sentencing guidelines scheme and the numerous increases he is subject to as specific offense characteristics bringing his

offenses quickly beyond the severity of murder and physical violence.

Mr. Maitski's offenses are indeed very serious, but these different offenses are similarly serious, if not more serious, and call for far less time in prison for first time offenders. Given 3553(a)'s directive to provide just punishment for this offense and promote respect for the law, consideration of these other offenses is necessary to achieve a sentence that is sufficient, but not greater than necessary.

**(B) Afford Adequate Deterrence**

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. Imposition of a guideline sentence of life is especially troubling when research confirms there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id.* at 1031. The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of

Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter crime. *See Id.*

As a result of these studies, Mr. Maitski submits that a lengthier term of incarceration in unnecessary to achieve a deterrent effect, as it would not actually achieve the stated purpose of sentencing. Counsel urges the Court to consider that the minimum sentence of 180 months of incarceration for someone who has never been sentenced to jail or prison before will have an enormous deterrent impact, and imposing a longer sentence would not increase deterrence.

### (C) Protect the Public From Future Crimes of Defendant

Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the § 3553(a) factor of specific deterrence also supports Mr. Maitski's request for a downward variance.

A 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. First, incarceration has a negligible impact on crime prevention. Instead, a longer prison sentence may actually lead to a greater risk of recidivism. There is strong evidence that prison - by disrupting employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to more serious offenders - leads to increased recidivism.

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, Par. 14 (1887).

In light of this research and the 15-year minimum mandatory penalty which must be imposed, resulting in the earliest possible release for Mr. Maitski in his mid-seventies, counsel submits that a longer sentence would not be effective in generating greater specific deterrence.

In addition, research establishes that older offenders are substantially less likely than younger offenders to recidivate following release. During a U.S. Sentencing Commission study on aging and recidivism, over an eight-year follow-up period upon release 13.4 percent of offenders age 65 or older at the time of release were rearrested. The Commission found that younger offenders were more likely to be rearrested than older offenders, were rearrested faster than older offenders, and committed more serious offenses after they were released than older offenders. The Commission's research shows that the younger than 30 age group had the highest rearrest rate (64.8%) and the rate declined with each age group that follows. *See* U.S.S.C. Research Report, *The Effects of Aging on Recidivism in Federal Offenders*,

(Dec. 2017) (https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders)

The same study also reviewed impact of educational level on recidivism and found it had a similar impact as age. In all age categories, those offenders with higher education had a lower risk of rearrest following release. Therefore, Mr. Maitski, a college graduate, is among the group with the lowest risk of rearrest in the category of those 65 or older at the time of release, which is the lowest-risk age group for recidivism.

Lowered risk of reoffending in sex cases is also associated with female victims, non-familial victims, a history of stable employment, history of age-appropriate dating relationships, absence of any prior criminal history, including lack of prior violent or sexual offenses, and amenability to mental health treatment. Mr. Maitski's case has all of these protective factors supporting the premise that a 15-year prison sentence is adequate to protect the public from future crimes. Despite his prior unemployment, leading to untreated depression, he had been stably employed at one job for five years leading up to his arrest. (PSR ¶ 101) His 30-plus year relationship with his ex-wife, who is 57, (PSR ¶ 90), and prior romantic relationships demonstrate a history of age-appropriate dating. Dr. Orozco specifically documented this marital and social history to include three prior committed relationships with adult women who were age appropriate. (PSR p. 36)

Accounting for these facts, the recidivism studies on aging and education level, and the positive treatment prognosis Dr. Orozco expects, the need to protect the public from future crimes is adequately addressed with a sentence of 15 years in prison, followed by 15 years of supervised release, including a lifetime of sex offender registration.

### (D) Provide Correctional Treatment in the Most Effective Manner

Based upon the positive treatment prognosis Dr. Orozco reports in her evaluation, it is apparent that 15 years in the BOP will afford him all the time necessary to engage in all sex offender treatment programs and therapies available within the BOP. None of the available programming requires a sentence beyond 15 years to complete. Further, it would in no way be more effective for purposes of treatment and rehabilitation to incarcerate Mr. Maitski beyond 15 years. Counsel submits that the goal of "providing correctional treatment" is to rehabilitate offenders for successful re-entry to society, and given the low risk of re-offense and his marked amenability to treatment, a sentence of 15 years will be most effective in carrying out this purpose of sentencing.

### (III)   The Need To Avoid Unwarranted Disparities

At this point, it is abundantly clear that a downward variance is appropriate. The extent of the variance must take into account the need to avoid

unwarranted sentencing disparities among similarly situated defendants.

According to the U.S. Sentencing Commission's 2021 Research Report on Federal Sentencing of Child Pornography: Production Offenses, the majority of offenders received downward variances from the guideline range, and 80.9% of offenders in the study were sentenced for an offense that involved sexual contact with a minor victim.

Mr. Maitski should surely fall into the category of those receiving a downward variance, and although his Mr. Maitski's case involves a sexual act (masturbation), it very notably *does not* involve sexual contact. This is critical in identifying that his case is an outlier among the group of child pornography production offenders. (PSR ¶ 63)

Further, the average sentence in all production cases nationwide was 275 months, just under 23 years. The study noted that longer sentences above the average of 275 months were imposed for offenders who victimized infants (364 months on average), or toddlers (330 months on average), were parents of victims (340 months on average), engaged in or facilitated sexual contact during the offense (307 months on average) or incapacitated victims (313 months on average). Mr. Maitki's case does not involve any of those noted factors leading to sentences in the above average range according to the 2021 study. Given this

information, a sentence above 275 months for Mr. Maitski's offense would constitute an unwarranted sentencing disparity.

The United States Sentencing Commission's 2021 report provides insight into three main factors courts consider in fashioning sentences in child pornography production offenses. The three factors are (1) proximity, meaning physical proximity and relationship between offenders and victims, method of communication used to induce the offense and whether offenders and victims lived in the same household, (2) participation, meaning the method used to produce the child pornography and whether the offender engaged in sexual contact with the victim, or manipulated victims by incapacitation, coercion or misrepresentation and (3) propensity, meaning the offenders level of engagement in other child pornography or exploitive conduct such as distribution or collection, or engagement in unrelated physical sexual abuse of a child. The Commission noted that "child pornography production offenders' offense conduct and degree of harm to the victim varies based on physical proximity and personal relationship with the victim. A majority of production offenders maintained a position of trust over their victims, whether through familial relationships or by virtue of

the offender's role as a teacher or coach, for example....And offenders in close physical proximity to the victim(s) also had sexual contact with the victim(s) in most cases." This explains why a significant downward variance below the average sentence of 275 months is warranted for Mr. Maitski.

He was in a physically remote location, different states from the victims, maintained no position of trust as a relative, teacher, etc, and had no sexual contact with the victims. As to the participation prong, the photos and videos in the case were "victim-produced content" that did not involve Mr. Maitski having any sexual contact with the victims, nor did it involve manipulating victims by incapacitation or coercing victims through extortion or threats, the only misrepresentation was as to his identity.

Looking at Mr. Maitski's conduct in comparison to other offenders throughout the country, even more disparities are apparent. First, the United States Sentencing Commissions 2021 report highlights the typical production offender maintains a position of trust over the victim and most commonly has physical access to the child during the production of child pornography, which frequently culminates in the offender having sexual

contact with the victim during the offense. The smaller, but growing proportion of offenders are strangers who initially contact victims remotely through the internet or other   mobile technology to produce child pornography." Mr. Maitski falls into the latter category of offenders. The fact that this category of offenders is growing demonstrates that the guideline framework is outdated, and doesn't adequately differentiate between more serious and less serious offense conduct as was originally intended.

Based on the research cited above, Mr. Maitski must fall into the category of "less serious" offenders being sentenced to 275 months or less for production of child pornography offenses. Given the lack of sexual contact, and physical proximity to any victim, the ages of the victims being "teen" and not "toddler or infant", and lack of position of trust, imposition of a sentence of 275 months or above would create an unwarranted sentencing disparity, inferring that Mr. Maitski is an "average"  or above average culpability production offender when he is not.

## CONCLUSION

Based upon all of the foregoing, Mr. Maitski submits that a sentence of 15 years of imprisonment, followed by 15 years of supervised release is sufficient, but not greater than necessary to effectuate the purposes of sentencing given that there was no

21

physical contact with any minor in his case, and he is a good candidate for treatment. He respectfully requests that he be placed at FMC Devens, in Massachusetts to undergo sex offender treatment, as this facility is the closest in proximity to his relatives in Pennsylvania.

Respectfully submitted,

_____
Susan M. Malove, B.C.S.
Florida Bar No. 0072126
390 N. Orange Ave., Ste. 2300
Orlando, FL 32801
Telephone: (407)374-2727
Facsimile: (407)374-2734
susan@malovelaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically furnished by CM/ECF delivery to Assistant United States Attorney Richard Varadan on October 8th, 2025.

_____
Susan M. Malove, B.C.S.
Florida Bar No. 0072126
390 N. Orange Ave., Ste. 2300
Orlando, FL 32801
Telephone: (407)374-2727
Facsimile: (407)374-2734
susan@malovelaw.com